# IN THE HEALTH CARE ALTERNATIVE DISPUTE RESOLUTION OFFICE

Judy Annette Henson as Administratix of
The Estate of David Wayne Henson
309 Gap View Blvd
Harpers Ferry, WV 25425



Claimant,

v.

Case No.: 2019-

Ameet Sharad Parikh, DO
20010 Century Blvd, Ste 200,
Germantown, MD 20874

       Serve on:
       Emergency Medicine Associates, P.A. P.C.
       CSC-Lawyers Incorporating Service
       7 St. Paul Street Suite 820
       Baltimore, MD 21202
and

Emergency Medicine Associates, P.A. P.C.
20010 Century Blvd, Ste 200,
Germantown, MD 20874

       Serve on:
       Emergency Medicine Associates, P.A. P.C.
       CSC-Lawyers Incorporating Service
       7 St. Paul Street Suite 820
       Baltimore, MD 21202

Health Care Providers.

## STATEMENT IN SUPPORT OF CLAIM

COMES NOW the Claimant, Judy Annette Henson as Administratix of the Estate of David Wayne Henson, by and through her attorney, Stephen G. Skinner, pursuant to the Health Care Malpractice Act, Md. Code Ann., Cts & Jud. Proc., §3-3A-01, *et seq. (1976, 2006 Repl. Vol.)* and hereby sues Health Care Providers, Ameet Sharad Parikh, DO (hereinafter "Dr. Parikh") and Emergency Medicine Associates, P.A. P.C.



## JURISDICTION/VENUE

1.     The Health Care Alternative Dispute Resolution Office ("HCADRO") has jurisdiction over this matter pursuant to MD Cts & Jud. Proc Code Ann., Cts & Jud. Proc., §3-3A-01, *et seq*.

2.     The amount in controversy exceeds $30,000.00 dollars ($30,000.00), exclusive of interests and costs.  The amount of this claim exceeds Thirty Thousand Dollars ($30,000.00), the required amount set forth in the Annotated Code of Maryland, Courts and Judicial Proceeds Article 3-2A-02

3.     Venue is proper in the United States District Court for the District of Maryland, as this controversy involves a dispute between citizens of different states.

## PARTIES

4.     Claimant, Judy Henson as Administratix of the Estate of David W. Henson, is a resident of the State of West Virginia at 150 Whitehall Drive, Charles Town, WV 25414, Berkeley County, West Virginia.

5.     All events giving rise to this claim took place in Jefferson County, West Virginia and Dr. Parikh at all times relevant hereto was employed in Montgomery County, Maryland.

6.     Dr. Parikh is, and at all times herein relevant was, a physician licensed to practice medicine in Maryland and West Virginia.

7.     Dr. Parikh owed a duty of care to provide medical care and treatment to David W. Henson in accordance with applicable standards of care.

8.     At all relevant times, Dr. Parikh was an employee, agent, and/or representative of Emergency Medicine Associates, P.A. P.C.

9.     Emergency Medicine Associates, P.A. P.C. is a business organized and existing under the laws of the State of Maryland with its principal place of business located at 20010 Century Blvd Ste 200, Germantown, Montgomery County, Maryland 20874.

10.     Dr. Parikh represented to the public and to David W. Henson that he would provide experienced, highly skilled medical/emergency care, that he would provide any and all care and services that David W. Henson would need, and take these representations with the intent to further the trust of David. Henson.

11.     At all times of which the Claimant complains, Dr. Parikh was acting individually and as the real, apparent and/or ostensible agent, and/or servant and/or employee of Emergency Medicine Associates, P.A. P.C.

## FACTS COMMON TO ALL COUNTS

12.     Claimant incorporates in this Count those facts set forth in paragraphs 1 through 11, hereinabove, including subparagraphs, by reference thereto, as if fully set forth herein.

13.     Mr. Henson was 72 at the time of the events surrounding this case.

14.     David W. Henson presented to the ED at Jefferson Medical Center on 1/22/17 at 9:19 a.m. via ambulance following a fall at home the day before. Following triage, Mr. Henson was treated by Ameet Sharad Parikh, DO during this ED visit. Dr. Parikh noted that Mr. Henson fell while walking and that he landed on carpet. He notes that the point of impact was the left hip and head. He further noted that Mr. Henson has pain in the head and left hip. Dr. Parikh notes that Mr. Henson was ambulatory at the scene. Pertinent negatives include, no fever, no numbness, no abdominal pain, no nausea, no vomiting, and no loss of consciousness.

15.     Also documented is: 72 y/O MALE ESCORTED TO ED BY EMS AFTER A FALL. THE PT REPORTS THAT HE HAD AN ONSET OF DIZZINESS WHILE WALKING TO HIS BEDROOM YESTERDAY EVENING AND FELL. THE PT STS THAT HE FELL ONTO HIS LEFT SIDE AND STRUCK HIS HEAD ON THE FLOOR. DENIES ANY LOC, NECK PAIN, OR NUMBNESS. THE PT STS THAT HE HAS HAD LEFT HIP PAIN SINCE THE FALL AND HAS HAD DIFFICULTY AMBULATING DUE TO HIS PAIN. PT DENIES ANY HEADACHE, CHEST PAIN, OR SHORTNESS OF BREATH PRIOR TO FALLING LAST NIGHT. PT STS THAT HE HAS CONTINUED TO FEEL DIZZY INTERMITTENTLY AND HAS BEEN FEELING GENERALLY WEAK THIS MORNING. THE PT REPORTS THAT HE IS CURRENTLY ON BLOOD THINNERS.

16.     Prior medical history was positive for atrial fibrillation; heart valve disorder with valve replacement; CABG.

17.     Pertinent medications that Mr. Henson was on at the time of his presentation to the ED include Plavix 75 mg per day; Warfarin (Coumadin) 4 mg per day; aspirin 81 mg per day; and, Doxycycline 100 mg 2 x per day.

18.     On physical examination, it is noted that Mr. Henson had a scabbed laceration on the posterior scalp with no active bleeding. Left hip pain to palpation. Alert, awake, and appropriate, normal speech and sensation.

19.     Medications administered during Mr. Henson's ED visit include Morphine 4mg/mL (2 mg intravenous given 1/22/17 1003); fentanyl 50 mcg/mL injection (50 mcg Intravenous given 1/22/17 1045).

20.     Blood work demonstrated RBC 3.92 (L); HGB 13.1 (L); PT 40.9 (H); and INR 3.79

21.     Diagnostic testing included x-rays of left hip and pelvis; CXR; and CT of brain WO IV contrast.

22.     CXR was normal. CT of brain findings were consistent with chronic micro vascular ischemic changes, no evidence of acute intracranial hemorrhage, mass, or midline shift. The left hip X-ray showed osteoarthritic degenerative changes, no evidence of acute fracture or dislocation. Mr. Henson also underwent an EKG which demonstrated A-fib.

23.     At 11:37 a.m., Dr. Parikh notes that "On reevaluation the patient reports that he is feeling better after receiving pain medication. Discussed results with the patient and his family and answered questions to satisfaction. The patient is stable for discharge and the patient's family is comfortable with taking him home."

24.     Mr. Henson was discharged in what was noted as stable condition. His discharge diagnoses were closed head injury; contusion of left hip; and, A-fib. Mr. Henson was discharged with Percocet 5-325 for pain.

25.     Mr. Henson presented to Berkeley Medical Center ED on 1/23/17, reporting that he could not weight bear on his legs. According to documentation from that encounter, Mr. Henson left the ED without being seen after triage. However, the documentation for that encounter does not include vital signs or review of any systems, which would be part of the standard of care for triage. There is also lack of any documentation that any level of patient acuity was determined by triage and/or that appropriate patient/family counseling was done with respect to what the emergency condition might be and/or what could happen to Mr. Henson if he was not seen by an emergency physician.

26.     Mr. Henson presented again to the Jefferson Medical Center via ambulance on 1/24/17 at approximately 13:21. He was treated on this occasion by emergency medicine physician Benjamin Chacko, M.D. Upon arrival, Mr. Henson was reported to be having altered mental status at home. He was noted to be A&O x2, to person and place, upon arrival to the ED. Upon physical examination, there was a hematoma along Mr. Henson's left flank measuring more than one (1) foot long. A CT of the abdomen/pelvis demonstrated a large, ill-defined, likely left gluteus maximus muscle hematoma and a large piriformis muscle hematoma. Mr. Henson's INR was 9.07; PT 99.6; HGB 7.4; and, RBC 2.23 – all of which were significantly abnormal and evidenced that Mr. Henson was hemodynamically unstable as would be consistent with bleeding, that is, the hematoma found on physical examination and by CT.

27.     Mr. Henson received 4 units of FFP (fresh frozen plasma) and 2 units of PRBC's (packed red blood cells). Due to the emergent condition of Mr. Henson upon arrival and the necessity to transfuse him rapidly, he became fluid overloaded and developed pulmonary edema. Ultimately, Mr. Henson was transferred to INOVA in Fairfax, Virginia, for continued treatment of his critical condition. Unfortunately, Mr. Henson's condition continued to deteriorate and he died on 2/2/17 from complications of pulmonary edema.

28.     In summary, David W. Henson presented to Jefferson Medical Center on 1/21/2017, after falling at home and with severe hip/leg pain; difficulty ambulating; on 3 anti-coagulation medications, as well as an antibiotic, which, in combination, effect coagulopathy; and,

borderline anemia with abnormal PT and INR. This was highly suggestive of either bleeding/developing hematoma or the likelihood that bleeding/hematoma would develop over the next 24-48 hours. This scenario went unappreciated by the treating emergency physician, Dr. Parikh. Because these signs/symptoms were not appreciated, Mr. Henson was discharged home instead of being admitted for observation/monitoring, such that when Mr. Henson returned to Jefferson Medical Center on 1/24/17, his condition was so emergent that he required rapid and aggressive treatment that placed him at significant risk for pulmonary edema. Mr. Henson developed pulmonary edema as a proximate result of the rapid and aggressive treatment (transfusions), which proximately caused his death on 2/2/17.

## MEDICAL NEGLIGENCE

29. Claimant incorporates in this Count those facts set forth in paragraphs 1 through 27, hereinabove, including subparagraphs, by reference thereto, as if fully set forth herein.

30. Dr. Parikh owed to the public at large and to Claimant, a duty to use that degree of skill and care typically exercised by health care practitioners in the same specialty with like training and experience in the same or similar circumstances.

31. Claimant alleges that Dr. Parikh owed to Mr. Henson the duty to exercise reasonable care, skill and judgment expected of a competent health care provider acting in the same or similar circumstances, which duty included, but not limited to, the recognition for patients who present following a fall and who are on Plavix; Warfarin (Coumadin); aspirin; and, Doxycycline (antibiotic) and who exhibit signs/symptoms of bleeding/hematoma such as anemia and/or visual hematoma and develop the need for management of those conditions, including the risk of pulmonary edema if/when rapid transfusion becomes necessary, all of which Dr. Parikh failed to do.

32. Dr. Parikh was negligent in his care and treatment of David W. Henson, by breaching the standard of care in the following ways:

The applicable emergency medicine standards of care for a patient that presents with a fall such as that described by Mr. Henson (points of contact head and left hip) and who is on anti-coagulation medications (Plavix, Warfarin, and aspirin) and doxycycline (antibiotic) (which medications, in combination, effect coagulopathy) and who is reporting difficulty with ambulation and significant pain, required Dr. Parikh to do the following:

a) to perform an adequate physical examination of Mr. Henson, specifically to include visualization of the left hip area to check for hematoma;

b) to order a CT scan of the pelvis/left hip area – an x-ray will not show any micro fractures and/or a developing hematoma;

c) to consult with neurology to ensure that Mr. Henson underwent a MRI of the brain;

d)     to appreciate not only how anti-coagulant drugs, but also how antibiotics, in combination, effect coagulation in a patient who suffers a trauma;

e)     to recognize that on 1/22/17 Mr. Henson already had abnormal coagulopathy and was borderline anemic (suggesting bleeding);

f)     to admit Mr. Henson for ongoing observation/monitoring/treatment;

g)     to specifically advise Mr. Henson and his family of the potential for developing/worsening bleeding and the hemodynamic crises that may result from such and the specific signs/symptoms to watch for relating to such.

33.     At all times relating to this claim, Dr. Parikh represented to David W. Henson and the public that he possessed the degree of skill, knowledge and ability possessed by reasonably competent medical practitioners, practicing under the same or similar circumstances and those involving the David W. Henson.

34.     The Claimant alleges that Dr. Parikh, including his duly authorized agents and/or employees, owed to David W. Henson the duty to exercise reasonable care, skill and judgment expected of a competent medical practitioner acting in the same or similar circumstances.

35.     This duty included the performance of adequate and proper diagnostic tests and procedures to determine the nature and severity of David W. Henson's condition, careful diagnosis of such condition, employment of appropriate procedures, surgery and/or treatment to correct such conditions without injury upon the David W. Henson, continuous evaluation of David W. Henson's condition and the effects of such treatment , and adjustment of the course of treatment in response to such ongoing surveillance and evaluation, all of which Dr. Parikh failed to do.

36.     The breaches of the applicable medical standard of care by Dr. Parikh, as set out above, caused the death of Mr. Henson on 02/02/2017. Dr. Parikh's failure to provide care pursuant to acceptable emergency medical standards of care, as set forth above, was a direct and proximate cause of Mr. Henson's death on 02/02/2017. A timely recognition of bleeding/developing hematoma and/or the likelihood that bleeding/hematoma would develop and admitting Mr. Henson for ongoing observation/monitoring/treatment of such, would have, to a reasonable degree of medical probability, prevented the death of Mr. Henson. More specifically, had Mr. Henson been admitted on 01/22/2017, his labs would have been monitored closely and in an ongoing manner; his left hip, pain, mental status, and other vitals would have been observed and monitored closely and in an ongoing manner, such that his bleeding/hematoma and worsening hemodynamic instability would have been recognized and diagnosed timely. Had Mr. Henson's bleeding/hematoma and worsening hemodynamic instability been diagnosed timely, the necessary interventions (transfusions) would have been administered over a longer period of time rather than in the rapid and aggressive manner required here due to Mr. Henson's emergent/urgent condition on 01/24/2017, thereby significantly reducing or even eliminating the risk of pulmonary edema.

37.     The above breaches of the applicable medical standards of care by Dr. Parikh, as set out above, also set the stage for Mr. Henson and his family not appreciating the ongoing risk of bleeding/hematoma and the hemodynamic instability/crisis that could result therefrom. Specifically, when Mr. Henson presented to the ED at Berkeley Medical Center, he and/or his family complained of him being unable to weight bear on his legs. Neither Mr. Henson nor his family reported concern over a hematoma or potential bleeding as they had not been counseled by Dr. Parikh to be concerned about such.

38.     If Dr. Parikh had not breached the applicable emergency medicine standards of care, as set out above, Mr. Henson's bleeding/developing hematoma and worsening hemodynamic instability would have been diagnosed in a timely manner. Additionally, Mr. Henson would have received the necessary medical intervention in a timely and safer manner, and, to a reasonable degree of medical probability, would have had a greater than 80% chance for a successful therapeutic outcome and would have survived.

WHEREFORE, Claimant respectfully demands judgment against the named Health Care Providers, including any actual and/or apparent agents, independent contractors, servants and/or employees jointly and severally, for actual, general, special, and compensatory damages as a consequence of the negligence of the named Health Care Providers in an amount exceeding Thirty Thousand Dollars ($30,000.00), exclusive of interests and costs, and any other legal or equitable relief as justice requires.

Respectfully submitted,

Stephen G. Skinner
Bar ID: 20220
Client Funding #:1706090005
SKINNER LAW FIRM
PO BOX 487
Charles Town, WV 25414
304-725-7029
sskinner@skinnerfirm.com
*Attorney for the Claimant*

## IN THE HEALTH CARE ALTERNATIVE DISPUTE RESOLUTION OFFICE

Judy Anne Henson as Administratix of the
Estate of David Wayne Henson

Claimant,

v.

Ameet Sharad Parikh, DO, et al.

Health Care Providers.

RECEIVED
NOV 06 2019
HEALTH CARE
ALTERNATIVE DISPUTE
RESOLUTION OFFICE

Case No.: 2019-

## CERTIFICATE OF QUALIFIED EXPERT

Claimant, by and through undersigned counsel, hereby file this Certificate of Qualified Expert and state as follows:

1. I, Gayle Galan, M.D., pursuant to the Maryland Cts. and Jud. Proc. §3-2A-04(b)(1), have reviewed this matter on behalf of Claimant.

2. I have reviewed medical records of David W. Henson from January 22, 2017 to February 2, 2017 and have concluded that the care rendered to David Henson by Ameet Parikh, D.O. departed from the appropriate standard of care and caused injury to him.

3. Additionally, I devote less than 20% of my professional time to testifying in medical malpractice cases.

4. I am not a party, an employee or partner of a party, or an employee or stockholder of any professional corporation of which a party is a stockholder.

5.    A copy of my Certificate of Merit is attached hereto.


_Gayle Galan  MD_
Gayle Galan, M.D.


RECEIVED
NOV 06 2019
HEALTH CARE
ALTERNATIVE DISPUTE
RESOLUTION OFFICE

## SCREENING CERTIFICATE OF MERIT

I, Gayle Galan M.D. being first duly cautioned and sworn, state as follows:

1. I am a physician licensed to practice medicine in the State of Ohio and devote at least eighty percent (80%) of my professional time to the active clinical practice of medicine and/or to its instruction at an accredited school. My license has not been revoked or suspended in any state.

2. I am Board Certified in Emergency Medicine and Family Practice and have practiced since at least 1982. I am currently Chairman of Emergency Medicine and Emergency Medical Education at Selby General Hospital. I also am an Associate Director of Emergency and Urgent Care Medicine at Marietta Memorial Hospital System and a College Physician Hiram College

3. At the request of the law firm of the Law Offices of Kelly R. Reed, PLLC, I have reviewed the medical records of David Henson with respect to the care and treatment he received at Jefferson Memorial Hospital on 1/22/17 and 1/24/17; Berkeley Medical Center on 1/23/17; INOVA Fairfax Hospital 1/24/17 to 2/2/17.

4. I possess professional knowledge and expertise coupled with knowledge of the applicable medical standards of care to which my opinions herein are addressed. I hold all opinions stated herein to a reasonable degree of medical probability/certainty.

5. I am familiar with the standards of care applicable to this matter by virtue of my education: Case Western Reserve University School of Medicine, (1978) M.D. Degree, Cleveland, Ohio; my training Residency – Family Medicine, Akron City Hospital, (1978-1981), Akron, Ohio; Fellowship – Trauma, Maryland Institute of Emergency Medical Systems, (1982), Maryland; and Mini Residency – Occupational Medicine, University of Cincinnati, (1989), Cincinnati, Ohio) and, my experience Chairman-Emergency Medicine and Emergency Medical Education, Selby General Hospital, Akron, Ohio, (2012-Present); Chairman-Emergency Medicine, Marietta Memorial Hospital, Marietta, Ohio, (2009-2012); Chairman-Emergency Medical Education, Southwest General Hospital, Cleveland, Ohio, (2005-2009); Chairman-Emergency Medicine, St. Vincent Charity Hospital Systems, Cleveland, Ohio, (1997-2005); Director-Emergency Department, St. Joseph Riverside Hospital, Warren, Ohio (1994-1997); Director-Emergency Department, Wooster Community Hospital, Wooster, Ohio, (1989-1991); Associate Director- Emergency Medicine, St. Vincent Charity Hospital, Cleveland, Ohio (1983-1989); Emergency Staff Physician-Barberton Citizens Hospital, Barberton, Ohio (1982-1983)

6. At the time of the care rendered to David Henson, I devoted more than eighty percent (80%) of my professional time annually to active clinical practice in my medical field or specialty.

7. As a practicing emergency physician, I treat patients like David Henson. I am familiar with the applicable standard of medical care in 2017 for patients who present following a fall and who are on Plavix; Warfarin (Coumadin); aspirin; and, Doxycycline (antibiotic) and who exhibit signs/symptoms of bleeding/hematoma such as anemia and/or visual hematoma and develop the need for management of those conditions, including the risk of

1

pulmonary edema if/when rapid transfusion becomes necessary. I have reviewed the medical records of David Henson as they relate to his care and treatment at Jefferson Memorial Hospital and Berkeley Medical Center. I hold the following opinions in this matter all of which are based upon my education, training, and experience: my review of the medical records; and on a reasonable degree of medical probability and certainty:

a. David Henson was a 72 year old male who presented to the ED at Jefferson Memorial Hospital on 1/22/17 at 9:19 a.m. via ambulance following a fall at home the day before. Following triage, Mr. Henson was treated by Ameet Sharad Parikh, DO during this ED visit. Dr. Parikh noted that Mr. Henson fell while walking and that he landed on carpet. He notes that the point of impact was the left hip and head. He further noted that Mr. Henson has pain in the head and left hip. Dr. Parikh notes that Mr. Henson was ambulatory at the scene. Pertinent negatives include, no fever, no numbness, no abdominal pain, no nausea, no vomiting, and no loss of consciousness.

Also documented is: 72 y/O MALE ESCORTED TO ED BY EMS AFTER A FALL. THE PT REPORTS THAT HE HAD AN ONSET OF DIZZINESS WHILE WALKING TO HIS BEDROOM YESTERDAY EVENING AND FELL. THE PT STS THAT HE FELL ONTO HIS LEFT SIDE AND STRUCK HIS HEAD ON THE FLOOR. DENIES ANY LOC, NECK PAIN, OR NUMBNESS. THE PT STS THAT HE HAS HAD LEFT HIP PAIN SINCE TUE FALL AND HAS HAD DIFFICULTY AMBULATING DUE TO HIS PAIN. PT DENIES ANY HEADACHE, CHEST PAIN, OR SHORTNESS OF BREATH PRIOR TO FALLING LAST NIGHT. PT STS THAT HE HAS CONTINUED TO FEEL DIZZY INTERMITTENTLY AND HAS BEEN FEELING GENERALLY WEAK THIS MORNING. THE PT REPORTS THAT HE IS CURRENTLY ON BLOOD THINNERS.

b. Prior medical history was positive for atrial fibrillation; heart valve disorder with valve replacement; CABG.

Pertinent medications that Mr. Henson was on at the time of his presentation to the ED include Plavix 75 mg per day; Warfarin (Coumadin) 4 mg per day; aspirin 81 mg per day; and, Doxycycline 100 mg 2 x per day.

On physical examination, it is noted that Mr. Henson had a scabbed laceration on the posterior scalp with no active bleeding. Left hip pain to palpation. Alert, awake, and appropriate, normal speech and sensation.

Medications administered during Mr. Henson's ED visit include Morphine 4mg/mL ( 2 mg intravenous given 1/22/17 1003); fentaNYL 50 mcg/mL injection (50 mcg Intravenous given 1/22/17 1045).

Blood work demonstrated RBC 3.92 (L); HGB 13.1 (L); PT 40.9 (H); and INR 3.79

Diagnostic testing included xrays of left hip and pelvis; CXR; and CT of brain WO IV contrast.

2

CXR was normal. CT of brain findings were consistent with chronic micro vascular ischemic changes, no evidence of acute intracranial hemorrhage, mass, or midline shift. The left hip X-ray showed osteoarthritic degenerative changes, no evidence of acute fracture or dislocation. Mr. Henson also underwent an EKG which demonstrated A-fib.

At 11:37 a.m., Dr. Parikh notes that "On reevaluation the patient reports that he is feeling better after receiving pain medication. Discussed results with the patient and his family and answered questions to satisfaction. The patient is stable for discharge and the patient's family is comfortable with taking him home."

Mr. Henson was discharged in what was noted as stable condition. His discharge diagnoses were closed head injury; contusion of left hip; and, A-fib. Mr. Henson was discharged with Percocet 5-325 for pain.

c.   Mr. Henson presented to Berkeley Medical Center ED on 1/23/17, reporting that he could not weight bear on his legs. According to documentation from that encounter, Mr. Henson left the ED without being seen after triage. However, the documentation for that encounter does not include vital signs or review of any systems, which would be part of the standard of care for triage. There is also lack of any documentation that any level of patient acuity was determined by triage and/or that appropriate patient/family counseling was done with respect to what the emergency condition might be and/or what could happen to Mr. Henson if he was not seen by an emergency physician.

d.   Mr. Henson presented again to the Jefferson Memorial Hospital via ambulance on 1/24/17 at approximately 13:21. He was treated on this occasion by emergency medicine physician Benjamin Chacko, M.D. Upon arrival, Mr. Henson was reported to be having altered mental status at home. He was noted to be A&O x2, to person and place, upon arrival to the ED. Upon physical examination, there was a hematoma along Mr. Henson's left flank measuring more than one (1) foot long. A CT of the abdomen/pelvis demonstrated a large, ill-defined, likely left gluteus maximus muscle hematoma and a large piriformis muscle hematoma. Mr. Henson's INR was 9.07; PT 99.6; HGB 7.4; and, RBC 2.23 – all of which were significantly abnormal and evidenced that Mr. Henson was hemodynamically unstable as would be consistent with bleeding, that is, the hematoma found on physical examination and by CT.

Mr. Henson received 4 units of FFP (fresh frozen plasma) and 2 units of PRBC's (packed red blood cells). Due to the emergent condition of Mr. Henson upon arrival and the necessity to transfuse him rapidly, he became fluid overloaded and developed pulmonary edema. Ultimately, Mr. Henson was transferred to INOVA in Fairfax, Virginia, for continued treatment of his critical condition. Unfortunately, Mr. Henson's condition continued to deteriorate and he died on 2/2/17 from complications of pulmonary edema.

3

David Henson presented to Jefferson Memorial Hospital after falling at home and with severe hip/leg pain; difficulty ambulating; on 3 blood thinning medications, as well as an antibiotic, all of which effect coagulopathy; and, borderline anemia with abnormal PT and INR. This was highly suggestive of either a developing hematoma or the likelihood that a hematoma would develop over the next 24-48 hours. This scenario went unappreciated by the treating emergency physician, Dr. Parikh. Because these signs/symptoms were not appreciated, Mr. Henson was discharged home instead of being admitted for observation/monitoring, such that when Mr. Henson returned to Jefferson Memorial Hospital on 1/24/17, his condition was so emergent that he required rapid and aggressive treatment that placed him at significant risk for pulmonary edema. Mr. Henson developed pulmonary edema as a proximate result of the rapid and aggressive treatment (transfusions), which proximately caused his death on 2/2/17.

The applicable emergency medicine standards of care for a patient that presents with a fall such as that described by Mr. Henson (points of contact head and left hip) and who is on blood thinning medications (Plavix, Warfarin, and aspirin) and doxycycline (antibiotic) (all of which medications effect coagulopathy) and who is reporting difficulty with ambulation and significant pain, required Dr. Parikh to do the following:

1.      to perform an adequate physical examination of Mr. Henson, specifically to include visualization of the left hip area to check for hematoma;

2.      to order a CT scan of the pelvis/left hip area – an xray will not show any micro fractures and/or a developing hematoma;

3.      to order a MRI of the brain;

4.      to appreciate not only how blood thinning drugs, but also how antibiotics can effect coagulation in a patient who suffers a trauma;

5.      to recognize that on 1/22/17 Mr. Henson already had abnormal coagulopathy and was borderline anemic (suggesting bleeding);

6.      to admit Mr. Henson for ongoing observation/monitoring/treatment;

7.      to specifically advise Mr. Henson and his family of the potential for developing/worsening of a hematoma and the hemodynamic crises that may result from such.

Dr. Parikh failed to act within the applicable emergency medical standards of care as set forth in 1-7 above, thereby breaching those emergency medical standards of care.

4

8. The breaches of the applicable medical standard of care by Dr. Parikh, as set out above, caused the death of Mr. Henson on 2/2/17. Dr. Parikh's failure to provide care pursuant to acceptable emergency medical standards of care, as set forth above, was a direct and proximate cause of Mr. Henson's death on 2/2/17. A timely recognition of a developing hematoma and/or the likelihood that a hematoma would develop and admitting Mr. Henson for ongoing observation/monitoring/treatment of such, would have, to a reasonable degree of medical probability, prevented the death of Mr. Henson. More specifically, had Mr. Henson been admitted on 1/22/17, his labs would have been monitored closely and in an ongoing manner; his left hip, pain, mental status, and other vitals would have been observed and monitored closely and in an ongoing manner, such that his hematoma and worsening hemodynamic instability would have been recognized and diagnosed timely. Had Mr. Henson's hematoma and worsening hemodynamic instability been diagnosed timely, the necessary interventions (transfusions) would have been administered over a longer period of time rather than in the rapid and aggressive manner required here due to Mr. Henson's emergent/urgent condition on 1/24/17, thereby significantly reducing or even eliminating the risk of pulmonary edema.

The above breaches of the applicable medical standards of care by Dr. Parikh, as set out above, also set the stage for Mr. Henson and his family not appreciating the ongoing risk of hemodynamic instability. Specifically, when Mr. Henson presented to the ED at Berkeley Medical Center, he and/or his family complained of him being unable to weight bear on his legs. Neither Mr. Henson nor his family reported concern over a hematoma or potential bleeding as they had not been counseled by Dr. Parikh to be concerned about such.

9. If Dr. Parikh had not breached the applicable emergency medicine standards of care, as set out above, Mr. Henson's developing hematoma and worsening hemodynamic instability would have been diagnosed in a timely manner. Additionally, Mr. Henson would have received the necessary medical intervention in a timely and safer manner, and, to a reasonable degree of medical probability, would have had a greater than 80% chance for a successful therapeutic outcome and would have survived.

5

10.    I do not have a financial interest in this case and I intend to participate in this case as a medical expert witness on behalf of the Estate of David Henson, and its counsel.

Further this Affiant sayeth naught.

_Gayle Galan MD_
GAYLE GALAN, M.D.


STATE OF OHIO:
COUNTY OF _Summit_ :

Subscribed and sworn to before me this _13th_ day of _March_, 20_19_.

My commission expires: _Nov. 21, 2019_.

_Dana J Esper_
Notary Public

DANA J ESPER
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
11-21-2019

6

## CERTFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of November, 2019, a copy of the foregoing Certificate of Qualified Expert was served via first class mail, postage prepaid on:

Ameet Sharad Parikh, DO
Emergency Medicine Associates, P.A.
c/o CSC-Lawyers Incorporating
7 St. Paul Street
Suite 820
Baltimore, MD 21202

Emergency Medicine Associates, P.A. P.C.
c/o CSC-Lawyers Incorporating
7 St. Paul Street
Suite 820
Baltimore, MD 21202

Stephen G. Skinner, Esquire

# IN THE HEALTH CARE ALTERNATIVE DISPUTE RESOLUTION OFFICE

Judy Annette Henson as Administratix of the
Estate of David Wayne Henson

     Claimant,

v.

Ameet Sharad Parikh, DO, et al.

Health Care Providers.



Claim No.: 2019-

## CLAIMANT'S WAIVER OF
## HEALTH CARE ALTERNATIVE DISPUTE RESOLUTION

Claimant, by undersigned counsel and pursuant to the Annotated Code of Maryland,

Courts and Judicial Proceedings Article §3-2A-06B, hereby waive arbitration of the above-

captioned action.

Respectfully submitted,

SKINNER LAW FIRM

By: _____

Stephen G. Skinner, Esquire
Bar ID: 20220
Client Funding #:1706090005
SKINNER LAW FIRM
PO BOX 487
Charles Town, WV 25414
304-725-7029
sskinner@skinnerfirm.com